No. 17-70012, Nelson v. Lumpkin, and we'll hear first from Mr. Kowarski. May it please the Court, I've reserved seven minutes for rebuttal. The line between claims that are decided on the merits and those that aren't can be difficult to draw. And one day, this Court will confront a case that implicates that difficulty. One day, a petitioner will have a bundle of federal court allegations that resemble allegations decided in state court, and the Fifth Circuit will have to decide whether the federal court and state court claims are the same. But today isn't that day because Nelson isn't that case. This Court's COA opinion uncontroversially applied existing precedent to determine that the Texas Court of Criminal Appeals did not deny the IATC participation claim on the merits. Because the allegations in the federal court claim and the state court claims have nothing to do with each other, this panel can safely save the more difficult questions for some later day. There was nothing new or ambitious about the COA ruling. It implied an unbroken line of precedent stretching back decades, including Escamilla, which specifically holds that the fundamental alteration test is the test a court must use to decide whether a federal court claim was decided on the merits. Mr. Kowarski, if that were so, why wouldn't we have just granted the writ? Why did we grant a COA instead? Judge Jones, it's because even though relitigation might not be precluded under Section 2254D, that doesn't necessarily mean I get relief. I still have to prove that I overcome procedural default. I have to prove that I'm entitled to introduce evidence. I have to win the claim on the merits. So there are lots of hurdles I have to clear, even though I may not be restricted by 2254D. Well, COA just means the issue is arguable on the merits and deserves encouragement to proceed further, right? Well, the application of the law to the underlying claim deserves encouragement to proceed further, but I don't think abstract statements of law are nonbinding, if that's the implication, because otherwise what's the point of having a published COA opinion? And even beyond that, it's not like Nelson is the case that sets the precedent for fundamental alteration. In due respect, Senator, what you need to address is the issue that piqued our interest, which is whether Nelson is entitled to investigatory funds to enable him to pursue the potential that these two individuals, he says were his accomplices, did not have valid alibis that they were present at the time of this crime, which he has admitted to being part of, but he says he was outside as a lookout. And this fellow swears he had beat up hands, and this other fellow, Jefferson, really killed these people. He's facing a death penalty. And he wants to show that they were the ones that acted as the killers. And the question is, is he entitled to get funds, money, from the federal courts to do this investigation? Indeed, Judge Dennis, setting aside the question of whether relitigation is restricted by Section 2254D, the audio in here isn't great. I understand you to be asking whether or not he would be entitled to develop facts on the underlying claim of ineffective assistance, both because he overcomes the procedural bar and because he shows enough merit on the underlying claim. Is that correct? We have a Supreme Court case in IESCA that fits this case like a glove. Tell us why Mr. Nelson is able, should be entitled to use that case to get some funds to do this investigation. Yes, Judge Dennis, I believe you're referring to IESCA v. Davis, which is the case that basically says that the Fifth Circuit's substantial need test for determining whether or not a prisoner is entitled to investigative services was not valid, and instead you use a reasonable probability test. And in order to apply that test, what you do is you look and see whether the underlying claim is non-trivial, whether the investigation will lead to admissible evidence, and whether there's a non-trivial chance that the claimant can overcome any procedural bars. And Mr. Nelson can do all of those things. Now, the COA grant already implies that the underlying claim is non-trivial. I can, of course, go into all the reasons why I think that's the case. Now, if the question centers on what State Habeas Council would have seen, all over Springs, knuckles and arms and feet, would have seen that all of the alibi testimony from Jefferson and Springs is blown up by the prosecution witness, Brittany Bursey. They would have noticed that Kelsey Duffer, the mother of Springs' child, says on volume 35, pages 21 and 22 of the reporter's record, that Springs' SIM card is in her phone in Venus, which accounts for the phone calls coming from Venus during the pertinent times. How was the evidence about the chemistry class blown up? It seems to me that was fairly well established as an alibi. Well, so first of all, there's a phone call coming from Mr. Jefferson's phone at 1108, which seems impossible if he's taking a test starting at 11 o'clock. The instructor of that course says there's no test that day. Jefferson says that he's taking a test at 12 o'clock, but his aunt, Brittany Bursey, testifies that she's at his house at 12 o'clock. His phone is quiet during the course of the murder, which is as consistent with Mr. Nelson's story as it is with his alibi. And then the rest of the story that he tells the grand jury, that Springs met him at his apartment after class and they drove directly to the mall, is contradicted not only by multiple other eyewitness testimony, but also from video records at the mall, which shows they weren't there until 4 or 5 o'clock. So frankly, the Jefferson story falls apart at a number of different points. You don't have to show for certainty that you would be able to find evidence that would destroy these alibis. Oh, certainly not. All you have to show is a reasonable potential, and that it's important to you as a death row inmate to pursue that. Get that evidence to show that. The test for whether or not I'm in time. I'm sorry, Judge Dennis, we're on a little bit of a lag, so I just want to make sure you're not done with your question before I answer it. You are done. Okay. The test under ayestas is what a reasonable lawyer would do under the circumstances. And a reasonable lawyer looking at this record would know that they need to look into the alibis. Now, of course, you can't prove— What I don't understand about this alibi theory is that wasn't there blood on Nelson's foot shoes or something like that? There was blood on his shoelace, which is consistent with him crawling under the desk to grab the laptop. Well, you can argue whatever you want to argue about that, but it definitely places him at the scene. So the most it seems to me that his defense could extract from the participation of these other guys is felony murder. That's correct. And you're not even going after guilt innocence, right? You're just going after the punishment phase, right? Your Honor, at this juncture, I don't think I have the evidence to credibly contest guilt innocence. I only have the evidence to credibly contest the anti-parties issue. Well, that's a pretty big problem, don't you think? Your Honor, I don't think so because the evidence shows that there were one or two other people at the scene that Springs and Jefferson are lying about their alibis and that trial counsel, when confronted with a ton of evidence indicating that they need to look into this, don't do that. Well, I did look up the background of Mr. Stickles and he was about as experienced as one could possibly expect counsel in a capital defendant case to be. He represented both sides, prosecution and defense, for many years before he went out on his own in private practice. And it's just . . . did he ever . . . do we have an affidavit from him, testimony? No, Your Honor, there's not. And unfortunately, I can't . . . because it's not in the record and I can't explain to you what happened because that information is not in the record, why that affidavit's not there. Well, you know, maybe it should have been developed earlier, but that wouldn't have been Mr. Stickles' fault. Well, Your Honor, I can't make Mr. Stickles talk to us unless I issue a subpoena bringing him into a hearing to do that if he doesn't want to do that voluntarily. Furthermore, the 104-page petition, which the Director likes to point to, remember that 10 of those claims are boilerplate claims that don't even mention Mr. Nelson. Four of those claims are embarrassing. They are fetal alcohol spectrum disorder claims ripped from Anthony Solis' petition. There's no fetal alcohol spectrum issue in this case. He forgets to change the name. There are references to Tony in the petition. There's claims that were raised on direct appeal and therefore non-cognizable. That means that there are two of the 17 claims in the state court application that are non-frivolous. There's the Wiggins claim, which has three and a half pages of information specific to Nelson. And then there's a claim about ineffective assistance with regards to security measures where there's four sentences that are specific to Mr. Nelson. So whatever Mr. Stickles' qualifications coming into this litigation, his representation in the state post-conviction proceedings here was abominable. And that's why there's nothing in the record that will allow me to tell you conclusively that there were other people at the scene of the crime. I need to be able to develop that information. I'm not asking the court to reverse and render on the underlying question. I'm asking the court to reverse and render on deficiency and remand the case with instructions to allow us to develop evidence so that we can show that there were other people at the murder scene. Strings is covered up. There is no way you could have ever developed evidence in the last 10 years since the fellow was tried. There are no pro bono places out there, no other counsel who could have associated no way in the world that anyone could have easily pursued these fellows. Your Honor, I'm candidly not sure what you're asking. I represent—Mr. Stickles was ineffective, so that's why the information wasn't developed there. So he's the lawyer at that time, and so there's other counsel that aren't working on it. And then I become the lawyer, and we ask for money immediately. I'm saying money is an excuse, frankly. If the man was not the person who bludgeoned these people, killing one, disfiguring the other, you're telling me there is no way short of the federal taxpayer's money that this could have been developed? Your Honor, I don't know whether there's some conceivable way or there's not, but if there's some conceivable way, that's not the test for whether I'm entitled to resources. The test for Section 3599— Any enterprising reporter could have gone out and found something and written a tabloid piece about it. Respectfully, Judge Jones, I wouldn't rather be here for the last four years pending litigation. I'd rather be investigating the case. Take an example. Kelsey Duffer, the mother of Anthony Springs' child, shows up at the police station and says, Oh, Nelson called Anthony at 1115 in the morning and said, Do you want to hit a lick? Do you want to rob somebody? Well, okay, I'm not a cell phone expert, but I go and I look at States Exhibit 370 and States Exhibit 377, and I say, Are there any calls from Nelson to Springs any time around 1115 in the morning? And there's not. There's no call from Nelson to Springs at the time. There's an unanswered call at 1045 in the morning, so that's not it. There's a call at 1240 after the murder takes place, so that's not it. Now, a reporter is not going to have casual access to that sort of information, but what I need to do is have a cell phone expert to help me develop that information. I need them to help me understand what all of the different cell phone records mean. I need to line that up against the DNA evidence and then the stories that the different witnesses are telling, which are internally inconsistent. You have Brittany Bursey placing Jefferson and Springs at her house at noon when Springs says he's waking up in Venus and when Jefferson says he's taking a test, and that's a prosecution witness. You have Jefferson saying, I was taking my test at 12 o'clock, and then I went home and I met Springs and we went straight to the mall, and you have Brittany Bursey saying, No, they're at my house at noon. You have mall footage showing that they're not there until 4 or 5 o'clock in the afternoon. Now, all of these things need to be put together. We need experts to help us tell our story and make our claim, and that's a modest request. We're not saying we're entitled to relief, but we are entitled to develop that evidence. Let me ask you a question that goes a little bit beyond this case, but I know that you handle a lot of these cases, and so I'm asking you as an officer of the court to help us with something. As you know, the law has developed in the last few years that our court has been, I'll use the word slapped down, but at least rejected in terms of being too strict at the COA stage. Maybe that goes back to Miller L, or I can't remember exactly what all the cases were. So it's kind of a dilemma for us in a sense because there's sort of what I'll call a gatekeeping function at the COA stage, and here there was, in fact, as you rightfully pointed out, a published opinion. So I guess you're telling us that maybe that's law of the case as to everything that was said there, but if we're trying to be a little bit more relaxed in the gatekeeping function to allow a full briefing on the merits and, in this case, oral argument, which I think is helpful, I guess what I'm suggesting is even if the opinion is published, the same panel in a case isn't really bound by a decision of either a different motions panel or the same panel on COA. So do you see the dilemma that I'm trying to describe? I sort of think that overall maybe it's more expeditious to get to the ultimate merits of these cases if we don't raise such a high bar at the COA stage, but then that means that at the merits stage, we should be open to considering the whole case and not bound tightly by an earlier opinion. I'm sorry, that's a long-winded question, but I invite your help. Sure. Your Honor, I understand the concern about the court trying to do a mitzvah and saying, okay, we're going to look carefully at this case and then thereby run the risk that people like me are going to come in here and try to bootstrap arguments about the non-triviality of the claim to the fact that you've agreed to look at the case and say that everything you've said provisionally is therefore binding law of the case. I'm not saying that. First off, the only thing that I'm saying is binding law of the case is this idea that the fundamental alteration standard is what controls the question of whether two claims, a claim in federal court and a claim in state court, are the same. But you know what? The court doesn't need to worry about that because that rule doesn't come from its COA opinion in Nelson. It comes from Escamilla, and Escamilla draws that construct from decades and decades and decades of cases about fundamental alteration in the exhaustion context. And this court doesn't have to worry about that problem because Trevino v. Thaler, Your Honor, which you wrote, there's an IATC sentencing phase claim in that case that is alleged in the state post-conviction proceeding. Nevertheless, when the federal counsel alleges a Wiggins claim, this court doesn't say, oh, the Wiggins claim, re-litigation is restricted under 2254D because you allege a sentencing phase IATC claim in state court. No, it says that claim wasn't decided on the merits, and we're going to analyze that claim under the Martinez and the Trevino framework. I know that's a long-winded answer, Your Honor. I mean, that's helpful. Of course, the state replies on Escamilla that Escamilla could not overrule Lewis or Clark, which Escamilla may have overlooked. I'm sure you have a good answer for that. I was waiting on this one because Escamilla cites Lewis and Clark, so I find it somewhat of an unserious argument that those cases were overlooked. And if the director's phrasing of Lewis and Clark sounds inconsistent with Escamilla, it's because the director isn't being candid about what Lewis and Clark state. I'm not going out on a limb here. As I said in my opening, I imagine this court is going to confront some really tough cases where there's a claim decided in state court on the merits, and then the claim gets to federal court, and the lawyer says, oh my goodness, the state suppressed this evidence in support of this claim, like Judge Jones confronted in Broadmax. And the court has to draw a really tough line when you're trying to introduce new proof in support of existing allegations that were decided on the merits in state court. But that's not what's happening here. The district court said there was no DNA evidence or other evidence linking Springs to the murder. Springs voluntarily gave a DNA sample to police. None of his fingerprints were found inside the church. Well, it's true that there's no DNA evidence there, but once again, there's a mountain of evidence that's not DNA evidence. No, all you're claiming is that there's circumstantial evidence that he might have been there. Respectfully, Your Honor, he's got bruising all over his hands. Bruising is not in the trial. The evidence to which he refers is not part of the state court record, is not properly authenticated, even assuming the court could consider it. Your Honor, I'm not sure what he means by that. It is in the record. It's in the police report that's drafted by Mr. Cato Blank. That Springs had bruising on his arms four days after the murder. Yes, Your Honor. Absolutely 100%. How is there any proof whatsoever that either the pastor or the secretary were strong enough to inflict a defensive, offensive wound, whatever you call them, on Springs? Your Honor, I can't remember exactly the page in the record. I mean, obviously, if you're a pastor and you're being attacked by three people, you don't have much chance to fight back. Okay, Your Honor, I'll try to answer these sequentially. Well, those are all surmises, but they're no different from your surmise. Well, Your Honor, actually, I believe it's the state's closing. I can't remember if it was guilt or punishment. They actually point out the fact that the victim is a giant man, and he's facing two people, not one. I don't think it's... You said it was three people, because we know that Nelson was right there. So there's Springs, and where's Jefferson? Well, Your Honor, Nelson is standing outside and comes in. He's not involved in the physical... That's what he claims. Correct. That's what he claims. But there's no evidence otherwise in the record. The only person who's showing any physical signs of a confrontation is Springs, and Detective Blank says, Where did you get those crazy bruises all over you? And he says he was putting his fist together in prison because he has a nervous fidget. His wife, his alibi... His girlfriend, his alibi is blatantly lying about the fact that she got a phone call at 1115 in which Nelson says, Oh, let's hit a lick. Most of the witnesses in this case are lying about something, right? Wasn't it up to the jury to tell whether they were telling the truth or not? Your Honor, I'll answer this question, and if it's okay, I'd like to... Go ahead. The question... Of course the jury is entitled to decide fact questions, but the issue in front of the court potentially is whether or not trial counsel was ineffective in putting the wrong information before the jury. The problem is that trial counsel saw all of these problems  on the anti-party's issues at sentencing, and they don't do anything. Okay, you have time for rebuttal. Mr. Cole? Good afternoon, Your Honors. May it please the court. This court granted a COA to decide whether Nelson can overcome any procedural default of the claim that his trial counsel rendered ineffective assistance at the punishment phase of his capital murder trial.    is not a member of the Supreme Court. The preferred way to resolve this appeal is to conclude that because the IATC claim itself is meritless or, at the very least, not obviously meritorious, Nelson cannot meet the higher burden required by Martinez, namely to show that his state habeas counsel rendered ineffective assistance during his state court collateral proceedings. Now, there are two other issues besides the procedural default issue that I raised in the briefing and broached the topside argument. That is, of course, the question of whether the claim is truly new and then the funding issue. But I'd like to turn first to the procedural default issue, if it would please the court, and then return to those two issues later in the argument. To overcome procedural default, a petitioner has to show that state habeas counsel was ineffective under the standards of Strickland, and that's Martinez at page 14. Now, what does this mean practically? It means that the court's task is to look at state habeas counsel's conduct and doing so, in our view, through what is really a lens of double deference. And I know that's typically something we think of as a phrase that's invoked when we're considering the interaction between 2254D and Strickland, but I do think of similar principles at work here, and here is why. The court is looking at state habeas counsel's assessment of trial counsel's conduct. Well, that assessment by state habeas counsel is itself subject to deference under Strickland and Harrington and the like, but state habeas counsel is also looking at trial counsel's own conduct, and he's looking at trial counsel's own conduct also through the lens of Strickland and Harrington. In other words, state habeas counsel is not only looking at the trial record at the time, but he's also taking that trial record as it comes in the light of the Supreme Court's governing law on this issue. So how does this really, I think, cash out practically for the court here? I think it does in this way. In order for Mr. Nelson to prevail here and to get through the Martinez gateway of procedural default, he would have to show that trial counsel's conduct was so obviously deficient that any reasonably competent habeas attorney would have so concluded and then included it in an IATC petition in state habeas court. I'm drawing that language from Torino, 2016 from this court. Now, here, our view is it can't certainly be said that trial counsel's conduct was so obviously deficient in this way, and of course, state habeas counsel's assessment of that will be subject to, again, Harrington and Strickland, and we know from Harrington that reasonable miscalculations about the merits of a claim are not chargeable to the attorney as incompetence under Strickland. Now, turning to the performance of trial counsel, which state habeas counsel is looking, there is, in fact, a mountain of evidence putting Nelson at the scene of the murder. There was physical evidence, his fingerprints were over the scene, his judgment. He admitted it. He did admit it, but also the victim's blood is on his shoes, not just the bottom of the tread, but also the top. He, of course, puts himself there, and his response is that, well, it was these two other fellows, Springs and Jefferson, but of course the jury heard that. And one could think, and certainly reasonable trial counsel could think, when we're looking here at the punishment phase, one could reasonably think that the jury's guilty verdict on the capital murder charge, that the jury rejected that theory. So the question here, looking at trial counsel's conduct, is the strategy in putting on a mitigation case, or the punishment phase case. And trial counsel could reasonably think that presenting the jury with this theory that they already heard, and likely rejected, would have been useless. The jury's not going to, and Knowles v. Mirzayans from the U.S. Supreme Court, 556 U.S. 111 from 2009, the court there says that counsel could have reasonably believed that there was almost no chance that the same jury would have reached a different result when considering similar evidence. I think that principle is at work here, particularly because counsel realized they had a very difficult case at punishment. They had to build a mitigation case, and they knew from the beginning that this trial was really going to come down to a mitigation case. They said that in their affidavits, which is in the state habeas record, at 164, and so they quite reasonably focused on mitigation, and also confronting the very difficult issue of future dangerousness. Of course, I'm referring to the fact that Mr. Nelson strangled an inmate with a bed sheet while he was awaiting this very capital murder for Pastor Dobbs. Trial counsel had to deal with those two things, and I don't think it can be said that it was unreasonable for trial counsel to make the strategic choice to focus on mitigation and to focus on future dangerousness. Now, of course, they didn't completely abandon the party's issue. They put on two witnesses at the punishment stage, a DNA expert, to say that there was an unknown print on a piece of masking tape, and also an expert to consider a hair that was found on Davis Springs or Nelson. Looking at this record, state habeas counsel could have absolutely reasonably concluded that trial counsel made a strategic choice as to how they were going to present the punishment phase. Moving on from performance, then we get to prejudice. Again, abstracting up to the state habeas counsel level, we would have to see an argument that Nelson could show that there's a reasonable probability he would have been granted state habeas relief. I'm drawing that from Newberry. Again, there is no reasonable probability of that here in our submission, precisely because the IATC claim itself is meritless and would not have prevailed in the state courts and the CCA. Again, there was a veritable mountain of evidence tying Nelson to the murder, and none tying Jefferson and Springs to the murder. Mr. Kavorsky noted that he kept mentioning that Brittany Bursey's blew up the alibis of some persons, but again, she wasn't speaking with military precision at the time, and I direct the court to volume 35 of the reporter's record, page 132. That's where she said, well, it could have been later in the afternoon. It was sometime afternoon. I didn't have a watch on. I'm not sure. So the idea that she blew up the alibis of these individuals, Springs and Jefferson, I don't think accords with the record, nor is there any evidence that Mr. Springs' mother of his child was lying about the alibi. Again, Kelsey Duffer was there, Mr. Springs' mother of his child, and then also her friend, Darian McLean. So there were two alibi witnesses that said they were with Springs the morning of the murder. And again, Jefferson was in class. Again, it was eminently reasonable for trial counsel to look at this record, look at the jury verdict of the punishment phase, and conclude that any investigation would have been fruitless. It wouldn't have exonerated Mr. Nelson, certainly. Again, he was at the scene. He puts himself at the scene. So we think ultimately the court could resolve this case by concluding that at the Strickland, on the Martinez issue, he can't come through the Martinez gateway. Now, there was a question about evidentiary hearings and things of that nature, and that could either be going to one of two issues, whether or not there should be a hearing on cause and prejudice, a so-called Martinez hearing, or a question about whether there should be a hearing if he can come through the procedural default bar of Martinez and then get a federal evidentiary hearing on marriage review. Now, this court has held in segundo that no one has a right to an evidentiary hearing on the Martinez issue, and to the extent that the funding motion would be conceived of as requesting such a hearing, that would be reviewed for abusive discretion. This court, again, has held that in segundo, and it's drawing from the Supreme Court's decision in Schriero v. Landrigan from 2007, and the court says a district court doesn't abuse its discretion with respect to a decision on an evidentiary hearing if the claim is unlikely to succeed or lacks merit. So we would say at both levels, he's not entitled to a Martinez hearing, and of course the question about whether a petitioner who's procedurally defaulted a claim can get an evidentiary hearing on federal marriage review, that's obviously the subject of the Supreme Court's forthcoming decision in Shin. Again, I don't think it comes down to that issue in this case, again, because he can't get through and we've made our arguments about Shin and why 2254E2 bars an evidentiary hearing even if he can come through procedural default, but of course the Supreme Court is going to weigh in on that coming next month. Unless it gets leaked earlier. I would not presume to have any knowledge about that. So the funding would only be pertinent to subsidiary to whether there could be a hearing? That's what I understand them to be requesting funding for. I understand from the briefing them to be requesting funding for the purposes of a federal evidentiary hearing on marriage review presuming of course that he can get through Martinez so that's what I understand the funding request to be for. Sticking with the funding request issue for just a moment, the question about whether or not you could get an evidentiary hearing goes to one of the third I think element of the Aiesta's test and that is whether or not he could clear procedural hurdles. We would submit of course that section 2254E2 is a procedural hurdle and of course he's not entitled to a Martinez hearing under this court's precedent. One of the other factors is the likelihood that services will generate useful and admissible evidence. And here we would say it wouldn't and that's precisely because the evidence that is being requested for the use of these funds appears to break down into three categories. This is from their briefing on page 48 I believe of the opening briefing. The funds are proposed to be used for the following. Interviewing Springs and Jefferson, interviewing Kelsey Duffer and then getting a handwriting expert hopefully to opine on Claude Jefferson's class entry and whether or not the signature was forced. All of this is speculative, it's remote. I don't think we can say it's likely to generate useful evidence. The suggestion I guess is that Mr. Springs or Mr. Jefferson will either, if they talk to Mr. Kavorsky, will either implicate themselves in the best case or say something that contradicts their testimony. I don't think there's any basis to believe that they would do so. The same goes for Kelsey Duffer. Do you think the district court was wrong in saying and this judge had clearly looked over the state record very closely, it appears the petitioner may not have decided until he testified at trial to implicate Jefferson. One of petitioner's known exhibits reflects the petitioner only identified Springs and himself as having been involved. I do think that's correct because it appears the first time Mr. Nelson implicated Jefferson was on the stand. Again, you're referring to the police report. I believe it's at ROA 2153 around that area. I'm not sure if that's the exact page, but that is the police report where Nelson only implicates Springs in this. 2158-59 is what I have here, but that comes from your brief, I think. Yeah, that could be the exact page. It was in that page range, yes. But yes, there's evidence in the record that he only late-breaking decided to implicate Jefferson. Of course, there's no evidence connecting Jefferson to this scene. Again, there's no reason to think that he was involved. And that's certainly not that his class sign-in sheet was forged. That's just speculative. And again, that goes to the fact that there doesn't seem to be any reason to think that a handwriting expert's going to say, yes, it was forged. What do you do with the cell phone silence that Mr. Kowarski referred to? The cell phone silence? I'm sorry, which one? Mr. Springs' cell phone? I think he referred to, I didn't write it down, but he referred to maybe there was an hour of cell phone silence. There was an hour of cell phone silence that was consistent with the testimony of him being in class, so I don't think it shows that he was at the murder scene. So I don't think it suggests that funding would be useful in generating testimony that he was there. Again, it's speculative. Even if the handwriting expert says that the class sheet was forged, that doesn't put him at the murder scene. It doesn't show that he beat Pastor Dobbs in his own church office to death. It doesn't show any of that. So again, I don't think any of the proposed uses of the funds would lead to admissible evidence. A final issue I'll return to was the question about whether or not this is truly a new claim, whether the ineffective assistance of counsel claim was new or whether it was adjudicated on the merits in state court. Of course, if it was adjudicated on the merits in state court, it would be barred by 2254D and there's been no argument here that he could overcome Section 2254D's relitigation bar. I think the starting point for this question is Crosby. Crosby refers to a claim as an asserted federal basis for relief from a state court's judgment of conviction and the Sanders case from the Supreme Court also says that you can have multiple facts proving identical grounds. And I think, importantly, I'd focus on Judge Easterbrook's opinion. I think it's instructive in the nature of this how to parse an ineffective assistance of counsel claim. And Judge Easterbrook says in the Peoples case that ineffective assistance of counsel is a single ground for relief no matter how many failings the lawyer may have displayed. Counsel's work must be assessed as a whole and it's the overall deficient performance rather than a specific failing that constitutes the ground for relief. Now, the claim in state court focused on sentencing phase performance of trial counsel. Now, it just appears to us that what is going on here is just trying to add more evidence in the record of ineffective assistance of counsel and, of course, we know from Ward and other cases like it from this court that that doesn't suffice to state a new claim. That's where you get into less than clear authorities that we have in this court. That's correct. And that's, frankly, why I started with the procedural default issue. I think it is the cleaner issue. It's the more probably a natural issue to go with to write an opinion disposing of... But normally under Cullen v. Penholster you wouldn't be able to expand on the I mean, we grant it as COA but that's not a definitive ruling on whether you could expand the record, I don't think. That's right. Certainly if this is not a new claim then he certainly would be barred under Cullen from introducing new evidence to support this claim. So really the only way he can get new evidence in is if he claims it's a procedural default and that he can get through the Martinez gateway there. And for the reasons I've mentioned, it does not appear that he performed. The trial counsel, his errors the alleged errors were not so obvious that any reasonable state habeas counsel would have included it in the petition. So there are several grounds open to the court to affirm the denial of habeas relief. Procedural default, again, is likely that he can't accomplish that, but certainly the court could hold that this is not a new claim and is barred by AEDPA's relitigation bar. If there are no further questions, I'll yield back my time. Judge Dennis, do you have any other questions? I don't think so, so yes, sir. Thank you, Your Honor. Mr. Kowarski. Thank you. I've reserved seven minutes for rebuttal. I'm going to start off talking about ayestas and then I'm going to talk about what state habeas counsel saw and what trial counsel saw. Now, I'm sorry. The director waived these arguments under ayestas. I could have briefed the issue of whether or not the investigation requested would have led to admissible evidence. I've got more than glancing familiarity with ayestas, but there is a footnote in the director's briefing about ayestas, and they say, oh, well, you don't have to worry about ayestas because the underlying claim is bunk or because it's not excused under Martinez. But there's no arguments relating to the second and third prongs of ayestas, and those are waived. I shouldn't be put in the position of having to argue about those for the first time on rebuttal. If the director wants to make those claims, then I would hope the court would ask for post-judgment briefing on the issue rather than decide them now. The only issue that was made relevant on the ayestas question was the merit of the underlying claim and whether it was capable of being excused under Martinez. Now, I'd like to talk briefly about what state habeas counsel saw when Stickles got his file, and the director cannot seriously contend that the IATC participation claim was ignored in favor of superior application content. That doesn't pass the laugh test. Post-conviction counsel saw bruising all over Springs' body that he attributed to a nervous fidget. He saw alibi testimony that was internally inconsistent. He saw that Springs' SIM card was in his girlfriend's phone in Venus. He saw a surviving victim that said that there were two attackers, not one. He saw interviews with Morgan Cotter and Allison Cobb saying that it was Jefferson in Springs and not Nelson. He saw that Springs was in possession of high-value proceeds from the robbery, and he saw that Springs is best friends with Jefferson and known to commit robberies with Nelson. The director's argument that this claim should be ignored... What do we do with the fact that it was referred to in the state's argument? What do we do with the fact that in talking to the police and Nelson's original narrative never mentioned Jefferson at the crime. He mentioned having seen Jefferson both before and after. Isn't that significant? Your Honor, I think the question is what Nelson told his attorneys and whether his attorneys were taken by surprise when he testified to that effect, and it's pretty clear if you read the testimony that the attorneys are not taken by surprise. And again, if I'm permitted to develop the record, I can show that the attorneys know before his testimony what he's going to say. Now, what the director is referring to is Officer Blank's interview at the police station with Nelson where Officer Blank says, hey, we have you and Anthony Springs in our crosshairs and Nelson talks about himself in Springs. He doesn't mention Jefferson at that point. It's true. Now, I don't want to get sidetracked with Jefferson. The question is whether trial counsel was deficient for failing to investigate not just Jefferson but also Springs and whether there was prejudice. And even if Nelson's story on the stand is not accurate in all of its particulars does not mean that there wasn't deficiency and it doesn't mean that there wasn't prejudice. Speaking of prejudice, don't take my word for it. Ask the prosecutor. The prosecutor thunders in favor of the lone wolf theory at both the sentencing phase closing and the trial phase closing. Don't take my word for it. Well, he won in the guilt phase. He won. And so he persuaded the jury. I mean, this is where you get caught in a bind by not arguing guilt innocence because the jury had just rejected that other people were participating or at least rejected that Nelson did not participate because after all he admitted participating. So they just found him fully guilty and then they get to mitigation and now you're going to say you being trial counsel. Well, you may have disbelieved his attempt on the stand to pawn off the responsibility on the other people, but we're telling you, you really should pawn off the responsibility and not give him the death penalty. Your Honor, no reasonable juror is going to buy that. That's just too inconsistent. But your Honor, the story that's there's the way the Texas you're stuck with guilt innocence. If you were to go back, if we were to grant habeas tomorrow and you were to go back for a new sentencing, and I use you generically for a new sentencing hearing, then the whole thing would come out about Nelson, you know, admitting that he's involved forensic evidence connects him, though it doesn't connect the other people. And then he's saying, and you know, I think it would have to come out, I believe so, that he's trying to pawn the blame off on other people. And now you're saying, well, those other people were really the bad guys and not him. And so the jury's sitting there thinking, okay, so where are these other people and how come the prosecutor never indicted him? Your Honor, it seems that we're conflating the question of felony murder with the question of whether the death penalty can be imposed in a felony murder case. And there's a delta between... No, I am not confusing those. What I am talking about is your argument about prejudice. Because prejudice is whether there's a reasonable probability that the jury would have looked more benignly upon Nelson, having found him to be the sole person with evidence connecting him to this crime, and then arguing in what amounts in the new guilt phase trial, oh, well, there were these other bad guys too. Your Honor, I've only got 30 seconds. I know, well, you can take the last one. Okay, thank you. As Your Honor knows, you can be found guilty for felony murder and still be ineligible for the death penalty. That's... I'm not disputing that. So if he's the lookout for an armed robbery in which there's an intentional killing, he can be guilty of felony murder and he can be guilty of capital murder in Texas, but he would still not be guilty of capital murder and... I know that's theoretically possible, but the whole point of the state's argument about Martinez and Trevino is at some point you have to show that habeas counsel was constitutionally ineffective in realizing that state trial counsel should have proven at the sentencing phase that other people bore more of the moral responsibility. To be clear, my argument is that trial counsel should have investigated the alibis and information... Yeah, but we're not there. We are not there on direct review of the original. Your argument is IATC participation, right? Your Honor, I've conceded that I don't have the evidence to stand in front of you and say... I know you want to develop more evidence, but I'm still saying... I mean, I don't think I misunderstand this case. I'm still saying you're ultimately talking about Martinez-Trevino, which in turn goes to the ineffectiveness of trial counsel, and you have to show that a trial counsel having allowed Nelson to go off on the stand and implicate a guy who was in class at the time, and you can say that's not true, but that's a weak claim. He's blathering on the stand, frankly. Then comes forward... Then you come forward in sentencing. This man has the victim's blood on his shoe. Jury found him guilty. But, oh, by the way, jury, here are these other guys. I'm talking about what the reasonable man, reasonable juror would have perceived, and how do you resolve that? Because I think that state habeas counsel looking at this record would say, oh, trial counsel would never have found themselves in that bind if they hadn't put it all on Mr. Nelson, if they had investigated... Originally, all three of them should have been indicted. Is that what you're saying? Your Honor, the standard for whether or not trial counsel should look into accomplices is not the same standard that a prosecutor uses when they're determining whether or not to indict somebody. You think the jury would never have convicted Nelson based on the idea that Springs and Jefferson were involved? Well, Your Honor, there was a juror affidavit saying, hey, we were really ticked off by the fact that they suggested that there were other people involved without there being any proof. They also sent a note out to the judge asking what would happen, would Nelson get out if he was not given a death sentence? Now, a jury that is contemplating a death sentence where it's a fata complete and he's going to be killed does not send a note out to the judge asking what happens if he doesn't get a death sentence. So, yes, I think the prejudice here is very substantial because this is a case... I didn't know, since when are we allowed to offer juror affidavits about all these things? Well, Your Honor, the law is that you can't accept juror affidavits about what happened in the juror room, but this is about the juror's experience while they're watching... What rule of evidence... Your Honor, I don't know offhand what the rule of evidence is, but candidly, this is an issue I researched before I walked in here because I expected that question. The case law does draw a distinction between a juror that is testifying... Federal or state? Excuse me? Federal or state? I believe it's federal. I believe it's federal. But, Your Honor, I'm happy to submit a post-hearing briefing on that. Well, I'm just... I had another case recently with juror affidavits, and I just thought you couldn't introduce them after the fact. The law is indeterminate when they're not being introduced for what happened in the jury room versus some other purpose. All right, well, I'll accept it, but I still don't understand. So, what you're really arguing is that they should have made a different conviction case in order to enhance the punishment case that this guy wasn't as responsible. Your Honor, I'm arguing they should have investigated alibis, and then what happens after that is about prejudice. But the deficiency isn't that they put on this case or that case. The deficiency is that they didn't try to look for evidence. Well, if that were so, you would be... It seems to me you would probably be... All right, you can say that, but ultimately you have to live with the fact that your guy is guilty irrespective of whether other people are involved, right? Your Honor, I'm not stipulating that he is guilty of capital murder. No, that the jury found him guilty of it and the verdict's not impeached, so that's that. And of course I'm aware that the jury found him guilty. I mean, it's one thing to say they didn't introduce mitigation evidence and that kind of thing, because mitigation is a stand-alone separate part of the sentencing phase. But what you're doing is really going back into the guilt phase in order to supposedly reduce responsibility at the sentencing phase. Your Honor, there's a separate stand-alone question called the anti-parties question that's issued at the sentencing... I am not confused with the anti-parties question. What I am saying is that the evidence, if you were correct, the evidence would have been entirely different in the guilt phase. That's certainly one possibility, but we have to investigate it to know. The prejudice is much more apparent at the penalty phase. I mean, again, the deficiency is the failure to investigate and the clearest prejudice is at the penalty phase. That's where I clearly win under a yes-diss. And of course it can be the case that evidence will then do double duty as showing he's not guilty of felony murder, but the anti-parties question exists so that we don't impose the death penalty on people who are lookouts when two other people are committing a robbery. He's a lookout from under the desk with the blood splattering all over the place. Right? I mean, he crawled under the desk to grab the phone. I mean, excuse me, to grab the computer. And that's what causes the jury to give him clemency. I'm sorry, Your Honor, I'm not sure I'm tracking. Again, I'm talking about how would a reasonable juror perceive this. He sets up, you want to hit a lick, finds the victims who are very appealing victims. They're bludgeoning them to death. You can't, you know, they have to kill, they have to seriously disable the pastor first. Then the secretary walks in and they start bludgeoning her. And he's a lookout from under the table. Your Honor, he comes inside and he says he crawls under the table to get the computer and it's not like he's caked in blood. There's a drop of blood on the top of his shoelace, which is very concerning. I'm just, I'm talking about the theatrics. What do you call it? The atmosphere, you know. Your Honor, it's a weak case. I'd say again, the test isn't what a reasonable juror believes. The test is what a reasonable trial counsel has done and then is there a reasonable probability that one juror, because the sentencing phase has a unanimity requirement, is there a reasonable probability that one juror might have reached a different result at the sentencing phase. And I think under a yes test, I'm clearly entitled to develop evidence to show if that's true and if I lose on the merits, so be it. But I'm at least entitled to develop that evidence and that's the way Section 3599F was set up to work. Not to decide the claim first and then backdoor your way into determination about whether I'm allowed to develop evidence. Well, if that were so, there would be no, well, I mean, we don't need to pursue this further, but theoretically, if you were correct, there would be no point to Colin v. Pinholster. There would be very little point to reliance on the state court record alone, which is one of the keystones of Edpa. Well, Your Honor, as you know, Colin v. Pinholster was a seismically important opinion because before Colin v. Pinholster... Because it interpreted the law that had been the law since Justice Rehnquist had put it into the old habeas law and reinforced that back in the 80s. Your Honor, as I understand the question, Colin, regardless of what Justice Rehnquist... Well, you're just suggesting that the funding comes first and then the development of the theories. And what I'm saying is that I was just, maybe I'm quibbling with your semantics. I'm not. No, Your Honor, I think you're right. I think if the claim were decided on the merits in state court and I were to come in here and my only argument is that I want to develop evidence to support the claim that was adjudicated on the merits in state court, unless I've got a really, really, really good reason, you should be able to say Colin v. Pinholster says that four claims decided on the merits in state court. You can't get that evidence in, so what is the point of me allowing you to develop that evidence? And that's fair. But that's not the world we're in when we're talking about this case because Colin v. Pinholster doesn't apply because the federal court claim was not decided on the merits in state court. Okay. Thank you. We are dismissed and we'll regroup to discuss the case. I'll rise.